Docket No. 24-6814

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

JOSE ANTONIO GARCIA
Plaintiff and Appellant,

vs.

COUNTY OF ALAMEDA and YESENIA SANCHEZ
Defendants-Appellees.

---

Appeal from the United States District Court
for the Northern District of California
Case No. 3:24-CV-03997-rs

---

## APPELLEES' ANSWERING BRIEF

---

Matthew D. Zinn
Aaron M. Stanton
Shute, Mihaly & Weinberger LLP
396 Hayes Street
San Francisco, California 94102
Telephone: (415) 552-7272
Facsimile: (415) 552-5816

Attorneys for Defendants-Appellees
County of Alameda and Yesenia Sanchez

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................4

PRELIMINARY STATEMENT..................................................................11

JURISDICTIONAL STATEMENT ............................................................15

STATEMENT OF ISSUES PRESENTED...............................................15

STATEMENT OF FACTS AND THE CASE ..........................................16

    A.    Sideshows, including spectators, present a growing hazard to public safety and quality of life in Bay Area communities. ...........................................................................16

    B.    Prior interventions have not successfully protected communities and individuals from harms associated with sideshows. ......................................................................17

    C.    The Ordinance protects public safety—including the safety of would-be spectators—and improves quality of life by penalizing participating in sideshows as a spectator. ..................................................................................18

    D.    One year after the County adopted the Ordinance, Plaintiff sued to enjoin its enforcement................................20

    E.    The District Court denied the preliminary injunction because the Ordinance regulates only non-expressive conduct and, in the alternative, satisfies intermediate scrutiny as a content-neutral regulation of the time, place, and manner of expression...........................................21

SUMMARY OF ARGUMENT .................................................................23

ARGUMENT ...........................................................................................25

I.    Standard of Review ......................................................................25

II.    The District Court correctly held that the Ordinance is not subject to First Amendment scrutiny because it is a generally applicable regulation of non-expressive conduct that, at most, marginally burdens expression...............................26

A. The Ordinance's marginal burden on recording does not subject it to First Amendment review. Courts have not recognized an unlimited First Amendment right to observe. .................................................................. 26

B. A generally applicable law's regulation of conduct in a traditional public forum does not automatically subject the law to First Amendment review. ..................................... 41

III. If it were subject to First Amendment review, the Ordinance would satisfy intermediate scrutiny. ............................................. 48

A. The Ordinance is content-neutral. ........................................ 50

1. The Ordinance is content-neutral on its face. ............. 51

2. The Ordinance is justified without reference to the content of speech. ..................................................... 57

B. The Ordinance is narrowly tailored to serve a compelling interest in public safety, including the safety of spectators themselves. ............................................ 61

1. The Ordinance advances compelling interests in public safety and quality of life. .................................. 63

2. The Ordinance advances interests in public safety and quality of life while imposing no greater burden on speech than necessary. ............................... 65

3. The Ordinance's distinction between sideshow spectators and others present at sideshows is justified by greater risks posed by and to spectators and does not render the Ordinance underinclusive. ........................................................... 70

C. The Ordinance leaves open ample alternative channels for communicating information. .......................................... 72

D. The Ordinance satisfies the *O'Brien* test. ............................. 76

CONCLUSION ...................................................................... 78

CERTIFICATE OF COMPLIANCE ...................................................... 80

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A Woman's Friend Pregnancy Resource Clinic v. Becerra,*
901 F.3d 1166 (9th Cir. 2018) ............................................................ 79

*Animal Legal Def. Fund v. Wasden,*
878 F.3d 1184 (9th Cir. 2018) ............................................................ 37

*Arcara v. Cloud Books, Inc.,*
478 U.S. 697 (1986) ................................................................. *passim*

*Ariz. Broadcasters Ass'n v. Brnovich,*
626 F. Supp. 3d 1102 (D. Ariz. 2022) ................................................ 69

*Artichoke Joe's Cal. Grand Casino v. Norton,*
353 F.3d 712 (9th Cir. 2003) .............................................................. 62

*Askins v. U.S. Department of Homeland Security,*
899 F.3d 1035 (9th Cir. 2018) ............................................................ 45

*Assurance Wireless USA, L.P. v. Reynolds,*
100 F.4th 1024 (9th Cir. 2024) .......................................................... 26

*B & L Prods., Inc. v. Newsom,*
104 F.4th 108 (9th Cir. 2024) ...................................................... 28, 59

*Barnes v. Glen Theatre, Inc.,*
501 U.S. 560 (1991) ........................................................................... 76

*Berger v. City of Seattle,*
569 F.3d 1029 (9th Cir. 2009) ............................................................ 69

*Branzburg v. Hayes,*
408 U.S. 665 (1972) ........................................................................... 46

*Brown v. Kemp,*
86 F.4th 745 (7th Cir. 2023) ........................................................ 33, 34

*Chestnut v. Wallace,*
    947 F.3d 1085 (8th Cir. 2020).............................................................. 32

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
    596 U.S. 61 (2022)............................................................................... 51

*Clark v. Cmty. for Creative Non-Violence,*
    468 U.S. 288 (1984)....................................................................... 50, 61

*Club Gallístico de Puerto Rico, Inc. v. United States,*
    414 F. Supp. 3d 191 (D. Puerto Rico 2019) ...................................... 39

*Cohen v. California,*
    403 U.S. 15 (1971)............................................................................... 56

*Cohen v. Cowles Media Co.,*
    501 U.S. 663 (1991)............................................................................ 37

*Colten v. Kentucky,*
    407 U.S. 104 (1972)................................................................... *passim*

*Comite de Jornaleros de Redondo Beach v. City of Redondo*
    *Beach,*
    657 F.3d 936 (9th Cir. 2011)............................................................. 64

*Doe v. City of Lafayette,*
    377 F.3d 757 (7th Cir. 2004)............................................................. 42

*Fields v. City of Philadelphia,*
    862 F.3d 353 (3d Cir. 2017) ............................................................. 32

*Fordyce v. City of Seattle,*
    55 F.3d 436 (9th Cir. 1995)............................................................... 45

*AE ex rel. Hernandez v. County of Tulare,*
    666 F.3d 631 (9th Cir. 2012)....................................................... 62, 72

*Hernández-Gotay v. United States,*
    985 F.3d 71 (1st Cir. 2021) ......................................................... 39, 40

*Hill v. Colorado*,
    530 U.S. 703 (2000)..............................................................57

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)................................................................55

*HomeAway.com, Inc. v. City of Santa Monica*,
    918 F.3d 676 (9th Cir. 2019)..............................................28

*Houchins v. KQED, Inc.*,
    438 U.S. 1 (1978)................................................................46

*Index Newspapers LLC v. U.S. Marshals Serv.*,
    977 F.3d 817 (9th Cir. 2020)................................... 47, 48, 71

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
    803 F.3d 389 (9th Cir. 2015)........................................ 25, 26

*James v. City of Long Beach*,
    18 F. Supp. 2d 1078 (C.D. Cal. 1998) ...............................76

*Jordan v. Adams Cty. Sheriff's Office*,
    73 F.4th 1162 (10th Cir. 2023) ..................................... 32, 45

*Kreimer v. Bur. of Police*,
    958 F.2d 1242 (3d Cir. 1992) .............................................42

*Leigh v. Salazar*,
    677 F.3d 892 (9th Cir. 2012). *Index*....................................47

*McCullen v. Coakley*,
    573 U.S. 464 (2014).................................................. *passim*

*Menotti v. City of Seattle*,
    409 F.3d 1113 (9th Cir. 2005)....................................... 64, 65

*Mitchell v. Newsom*,
    509 F. Supp. 3d 1195 (C.D. Cal. 2020) .............................28

*Nat'l Press Photographers Ass'n v. McCraw*,
    90 F.4th 770 (5th Cir. 2024) .................................. 34, 35, 37

*Ness v. City of Bloomington*,
    11 F.4th 914 (8th Cir. 2021) ............................................................. 55

*Nicodemus v. City of South Bend*,
    711 F.Supp.3d 1015 (N.D. Ind. 2024) ........................................ 73, 75

*Nunez ex rel Nunez v. City of San Diego*,
    114 F.3d 935 (9th Cir. 1997) ............................................................ 44

*Porter v. Martinez*,
    68 F.4th 429 (9th Cir. 2023) ........................................................... 68

*Preservation Coal., Inc. v. Pierce*,
    667 F.2d 851 (9th Cir. 1982) ................................................ 62, 68, 72

*Press-Enterprise Co. v. Superior Court of Cal.*,
    478 U.S. 1 (1986) ....................................................................... 47, 48

*Project Veritas v. Ohio Elec. Comm'n*,
    418 F. Supp. 3d 232 (S.D. Ohio 2019) ................................... 54, 77, 78

*Project Veritas v. Schmidt*,
    __ F.4th __, No. 22-35271, 2025 WL 37879 (9th Cir. Jan.
    7, 2025) .......................................................................... *passim*

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ......................................................................... 28

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ................................................................... 51, 57

*Reporters Comm. for Freedom of the Press v. Rokita*,
    __ F. Supp. 3d __, No. 1:23-cv-1805-JRS-MG, 2024 WL
    4333137 (S.D. Ind. Sept. 27, 2024) ................................................. 69

*Sanchez v. City of Atherton*,
    No. 22-cv-03106, 2023 WL 137475 (N.D. Cal. Jan. 9, 2023) ............. 32

*Schenck v. Pro-Choice Network of W. N.Y.*,
    519 U.S. 357 (1997) ......................................................................... 69

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011)..............................................................28

*Talk of the Town v. Dep't of Fin. & Bus. Servs. ex rel. City of
   Las Vegas*,
   343 F.3d 1063 (9th Cir. 2003)..........................................28

*Tik Tok Inc. v. Garland*,
   604 U.S. __ (Jan. 17, 2025)..............................................72

*United States v. Albertini*,
   472 U.S. 675 (1985)............................................................61

*United States v. O'Brien*,
   391 U.S. 367 (1968)...................................................*passim*

*United States v. Ullah*,
   976 F.2d 509 (9th Cir. 1992)............................................62

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989)...................................................*passim*

*Western Watersheds Project v. Michael*,
   869 F.3d 1189 (10th Cir. 2017)..................................33, 34

*Williams-Yulee v. Florida Bar*,
   575 U.S. 433 (2015)............................................................72

*Wright v. City of St. Petersburg*,
   833 F.3d 1291 (11th Cir. 2016)..................................41, 42

*Zemel v. Rusk*,
   381 U.S. 1 (1965).........................................................35, 46

## California Cases

*Raef v. Appellate Div. Super. Ct.*,
   240 Cal. App. 4th 1112 (2015).........................59, 67, 73, 77

## Other State Cases

*People v. Bergen*,
  883 P.2d 532 (Colo. Ct. App. 1994).....................................................39

## Federal Statutes

7 U.S.C.§ 2156(a)(2)...............................................................................39

28 U.S.C.§ 1292(a)(1)..............................................................................15

## California Statutes

Cal. Pen. Code
  § 413 .....................................................................................................39
  § 597.5 ..................................................................................................39
  § 597b ...................................................................................................39

Cal. Veh. Code
  § 23109.2 ..............................................................................................17

## Local Ordinances

Alameda County Code
  § 10.40.010 ...............................................................................*passim*
  § 10.40.020 ...............................................................................*passim*
  § 10.40.030 ..........................................................................................19

City of Los Angeles Municipal Code
  § 47.15 ..................................................................................................39

City of San Diego Municipal Code
  § 52.5203 ..............................................................................................39

City of San Jose Code of Ordinances
  § 10.50.020 ...........................................................................................39

## Other Authorities

Assembly Committee on Transportation, Analysis of AB
  1978 at 3 (Apr. 22, 2024) .................................................................18

Erwin Chemerinsky, *Balancing the Rights of Privacy and the Press: A Reply to Professor Smolla*, 67 Geo. Wash. L. Rev. 1152, (1999) ........................................................................... 73

Fox 11, *Orange County man arrested in New Mexico for South LA street takeover death of nursing student* (Jan. 17, 2023) .................................................................................. 12

Hilda Flores, *1 Killed after 'sideshow activity' leads to shooting in San Joaquin County, sheriff's office says* (May 23, 2023) .................................................................................. 11

Sara Stinson, *Video: Vallejo sideshow ends with looted 7-Eleven* (Feb. 26, 2024) ....................................................... 11

US EPA, *Tire Fires* (Feb. 22, 2016) ......................................................... 17

## PRELIMINARY STATEMENT

A cloud of toxic smoke drifts into the faces and lungs of teenagers and young adults lining the intersection. In front of them, a driver spins his car's rear wheels, intentionally burning off the tire's traction. The car takes off; the driver jerks the wheel, sending the rear of the car swinging out wildly. The car passes inches away from the crowd—if they are lucky. When the police arrive, racers and spectators alike career off at high speeds, hopefully, but not always, avoiding collisions with people and property. They leave behind garbage, destroyed intersections, and a shattered peace.

That is a "sideshow," an exhibition of reckless driving native to the Bay Area. As sideshows have proliferated, they have involved increasingly dangerous driving, gun violence,[1] looting, arson,[2] and illegal drug

---

[1] *See, e.g.,* Hilda Flores, *1 Killed after 'sideshow activity' leads to shooting in San Joaquin County, sheriff's office says* (May 23, 2023), https://www.kcra.com/article/sideshow-activity-deadly-shooting-san-joaquin-county-sheriffs-office/43961651.

[2] Sara Stinson, *Video: Vallejo sideshow ends with looted 7-Eleven* (Feb. 26, 2024), https://www.kron4.com/news/bay-area/video-vallejo-sideshow-ends-with-looted-7-eleven/?ipid=promo-link-block1.

use. Many spectators have been injured or killed,[3] either at the scene or in the chaotic aftermath. Sideshows are more dangerous than the sum of their parts—they represent a unique blend of toxic and unlawful behaviors, and spectators are a crucial ingredient. Sideshows exist for the audience; without spectators, there is only a reckless driver.

In 2023, Defendant County of Alameda adopted an ordinance that penalized participating in sideshows as a spectator ("Ordinance"). Specifically, the Ordinance prohibits knowingly being present within 200 feet of a sideshow for the purpose of observing it. The Ordinance says nothing about recording, photographing, or speaking at or about sideshows.

Plaintiff Jose Antonio Garcia, also known as Jose Fermoso, a traffic-safety reporter for *The Oaklandside*, alleges that the Ordinance violates his First Amendment rights by interfering with his reporting on sideshows. Plaintiff sought a preliminary injunction to bar the County from enforcing the Ordinance against him.

---

[3] *See, e.g.,* Fox 11, *Orange County man arrested in New Mexico for South LA street takeover death of nursing student* (Jan. 17, 2023), https://www.foxla.com/news/south-la-christmas-street-takeover-arrest-elyzza-guajaca.

12

The District Court correctly denied the preliminary injunction, finding he could not prevail on his claim. The court concluded that the Ordinance does not regulate expression. Rather, it prohibits non-expressive *conduct*: attending a sideshow for the purpose of watching the dangerous driving. This Court and others have repeatedly recognized that regulation of non-expressive conduct is not subject to First Amendment scrutiny, even if it incidentally limits some expression.

Plaintiff makes a sweeping claim to a First Amendment right to observe anything occurring in a public place. Although courts have recognized that audiovisual *recording* can be protected expression, they have not recognized a right to observe, and the Ordinance's effects on recording are solely incidental. The Ordinance prohibits participating in sideshows as a spectator, not recording, speaking, or reporting about sideshows. Further, as the District Court recognized, that the Ordinance applies to conduct in a traditional public forum does not transform the regulated non-expressive conduct into speech. The Ordinance is thus not subject to First Amendment review.

Even if the Ordinance were subject to the First Amendment, it is valid either (1) as a regulation of the non-expressive aspects of conduct

with both non-expressive and expressive elements, or (2) as the District Court concluded, as a content-neutral time, place, and manner restriction. Under either frame, the Ordinance passes intermediate scrutiny because it targets non-expressive participation in sideshows as a spectator based on that conduct's unique threats to public safety and quality of life. The Ordinance says nothing about expressive activity or content, nor does it seek to suppress speech, let alone speech on a particular topic. It also leaves open ample channels of communication. Plaintiff may continue reporting on sideshows: he may interview spectators, drivers, and bystanders; and he may use video or photographs taken by law enforcement, passersby, spectators, drones, telephoto lenses, or surveillance cameras. As with any other member of the public, the only thing he may *not* do is participate in a sideshow as a spectator.

The Ordinance, like other valid laws prohibiting spectating at illegal events such as animal fights, regulates dangerous conduct and not expression. If the Ordinance did regulate expression, it passes intermediate scrutiny as a valid, content-neutral time, place, and manner restriction. Plaintiff thus cannot succeed on the merits of his First

Amendment claim. This Court should affirm the denial of the preliminary injunction.

## JURISDICTIONAL STATEMENT

The County agrees that this Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1). The Court lacks jurisdiction over Plaintiff's claims because Plaintiff has failed to adequately allege injury in fact sufficient to establish Article III standing.

## STATEMENT OF ISSUES PRESENTED

1.     Does the First Amendment apply to an ordinance that prohibits intentionally joining the audience for illegal exhibitions of dangerous driving—"sideshows"—and has only an incidental effect on expression?

2.     Assuming such an ordinance is nonetheless subject to the First Amendment—

A.     Is that ordinance content-neutral, given that it prohibits conduct based on the actors' purpose and location and not on the existence or content of speech?

B.     Does that ordinance survive intermediate scrutiny where it advances government interests in protecting public safety and

quality of life of spectators and the general public while allowing ample opportunities for speech on any subject?

## STATEMENT OF FACTS AND THE CASE

### A.  Sideshows, including spectators, present a growing hazard to public safety and quality of life in Bay Area communities.

Sideshows present a serious threat to public safety. Spectators at sideshows risk death or injury, Excerpts of Record ("ER") 102, and many spectators at sideshows have been injured or killed, *id*. The risks of injury or death stem not only from the cars themselves, but also from the combination of dangerous behaviors associated with sideshows, including gun violence, looting, and arson. *Id.*; ER-103. Sideshows also require substantial law enforcement resources, diverting officers from other priorities. ER-102. Spectators and others are often killed or injured when drivers or spectators flee the scene at high speeds after law enforcement arrives. *Id*.

Sideshows also threaten quality of life. They block traffic, causing delays. *Id.* Sideshow events are loud. *Id.*; ER-171 ("The screeching tires and revving engines would create a cacophony that would reverberate through the rolling hills."). Smoke from burning tires contains harmful

16

chemicals. ER-173 (smoke drifts into nearby homes); *see also* US EPA, *Tire Fires* (Feb. 22, 2016), https://archive.epa.gov/epawaste/conserve/materials/tires/web/html/fires.html (last accessed Jan. 17, 2025). Crowds of spectators trespass, damage property, ER-172, and leave garbage, ER-103. Sideshow debris may even include the flaming wrecks of the cars used to perform stunts. ER-176. Some locations see multiple sideshows, exposing communities to these hazards repeatedly. ER-103.

### B. Prior interventions have not successfully protected communities and individuals from harms associated with sideshows.

The State and local governments have previously attempted to reduce harms from sideshows without much success. In 2002, the Legislature allowed law enforcement to arrest persons engaged in reckless driving and impound their vehicles. *See* Cal. Veh. Code § 23109.2. Some local jurisdictions have increased enforcement of traffic laws. ER-176-77. Some have installed physical infrastructure in streets to deter sideshows. ER-178.

Despite these efforts, sideshow activity has increased. The California Highway Patrol received almost 26,000 calls involving sideshow activity in 2020, an approximately 15% increase in calls from 2019.

17

Assembly Committee on Transportation, Analysis of AB 1978 at 3 (Apr. 22, 2024), https://trackbill.com/s3/bills/CA/2023/AB/1978/analyses/assembly-transportation.pdf. In 2023, that number increased to over 27,000 calls. *Id.* Bay Area jurisdictions have struggled to address sideshows. ER-103; ER-177 ("Even with all these penalties and enforcement efforts, police say sideshows have only become more frequent and more dangerous."). Plaintiff also acknowledges that infrastructure modifications have not deterred sideshow activity. ER-124; *see also* ER-103 (sideshow drivers circumvented infrastructure changes).

## C. The Ordinance protects public safety—including the safety of would-be spectators—and improves quality of life by penalizing participating in sideshows as a spectator.

In light of increasing sideshow activity, and after receiving numerous complaints from residents in the unincorporated County, the Sheriff's Office and a member of the Board of Supervisors sponsored an ordinance prohibiting joining sideshows as a spectator. ER-101, 105-19. The Board adopted the Ordinance in August 2023. ER-104.

The materials presented to the Board in support of the Ordinance described the dangers associated with spectating at sideshows. A presentation highlighted deaths and injuries, including those of a nursing

18

student and a toddler, caused by reckless driving and sideshow-related gun violence. ER-109. The presentation also described other unlawful acts associated with sideshows, including shootings, vandalism, arson, and destruction of public property. ER-111, 117.

The Board adopted findings demonstrating the necessity for the Ordinance. Alameda County Code ("ACC") § 10.40.010.[4] The findings state that sideshows involve damage to public property; monopolization of law enforcement resources; drug and alcohol use, reckless driving, gun violence, and vandalism caused by drivers and spectators alike; noise; air pollution; garbage left by crowds; and death and injury to spectators. *Id.*

To prevent these harms, the Ordinance prohibits participating in sideshows as a spectator. Specifically, it prohibits knowingly being "present" within 200 feet of a sideshow or the preparations for a sideshow "for the purpose of viewing, observing, watching, or witnessing the sideshow event as it progresses." ACC §§ 10.40.020, 10.40.030.

Notably, the Ordinance emphasizes that spectators *participate* in sideshows. It defines a "sideshow" as an event in which a person blocks a

---

[4] The Alameda County Code is available online at https://library.municode.com/ca/alameda_county/codes/code_of_ordinances.

public right-of-way "for the purpose of performing a street race or reckless driving exhibition *for one or more spectator(s)*." ACC § 10.40.020 (emphasis added). The Ordinance recognizes that there is no sideshow without spectators.[5]

Conversely, because it covers only people present "for the purpose" of participating in a sideshow as a spectator, the Ordinance avoids interfering with others in the area of a sideshow. It does not cover incidental observation of a sideshow by one present for another purpose (e.g., to wait for a bus, solicit donations, or advocate for a cause).

### D. One year after the County adopted the Ordinance, Plaintiff sued to enjoin its enforcement.

Plaintiff reports on traffic safety issues for *The Oaklandside*. ER-154-55. While Plaintiff "regularly rel[ies] on photographs, as well as video and audio recordings" in his reporting, ER-156, he has not stated that he has personally attended or recorded a sideshow. Rather, his reporting has used police data, post-incident interviews, *id.*, and images taken by others, *see* ER-163, 167, 170-74, 176, 178.

---

[5] Indeed, the importance of the audience is there in the name: side*shows*.

In 2024, nearly one year after the Ordinance was adopted, Plaintiff

sued to challenge the Ordinance and enjoin its enforcement. ER-190. He

alleged that the Ordinance violated the First Amendment on its face and

as applied to him. ER-202-04. Plaintiff sought a preliminary injunction,

arguing that the Ordinance is a content-based restriction on speech that

fails strict scrutiny. ER-147-51.

### E. The District Court denied the preliminary injunction because the Ordinance regulates only non-expressive conduct and, in the alternative, satisfies intermediate scrutiny as a content-neutral regulation of the time, place, and manner of expression.

The District Court denied Plaintiff's motion for a preliminary in-

junction. The court first held that the Ordinance does not regulate speech

and thus is not subject to First Amendment review. ER-6-11. Rather, the

court concluded, the Ordinance "is plainly directed at conduct," ER-8—

knowingly being present within 200 feet of a sideshow for the purpose of

observing it, ER-7 (citing ACC § 10.40.020)—and it has only an incidental

burden on speech, ER-8. The court reasoned that the targeted conduct is

non-expressive despite both its occurrence in a public forum and Plain-

tiff's "journalistic intent." ER-8-9. Rather, because of the Ordinance's

focus on "locational activity" rather than "speech production," the court

21

considered the Ordinance similar to "standard laws that restrict conduct in public areas for safety reasons, notwithstanding their impact on those who would engage in such conduct in order to speak"—laws that are likewise not subject to First Amendment scrutiny. ER-10.

In the alternative, the court held that if the First Amendment applied to the Ordinance, the Ordinance satisfies intermediate scrutiny. ER-11-14. The court concluded that the Ordinance is content-neutral because it "applies equally to silent spectators, spectators speaking or carrying signs addressing any topic and conveying any message, and spectators like [Plaintiff] who are preparing to speak in the future." ER-11-12. The court further concluded that the Ordinance is narrowly tailored to advance the compelling government interest in protecting public safety by "deterring spectating." ER-13. The court found that spectators contribute to the risks posed by sideshows, "including the risk of injury to the spectators themselves." *Id*. Finally, the court concluded that the Ordinance leaves open ample alternative channels for reporting on sideshows, including conducting and recording interviews of sideshow participants, recording sideshows from beyond 200 feet, using recordings from within 200 feet, and relying on public data. ER-14.

This appeal followed. ER-241. Further proceedings in the District Court have been stayed pending appeal. ER-248.

## SUMMARY OF ARGUMENT

The District Court correctly denied a preliminary injunction because Plaintiff is unlikely to prevail on the merits of his claim.

1.    The Ordinance is not subject to First Amendment scrutiny.

A.    Regulations of non-expressive conduct that only incidentally affect speech are not subject to First Amendment scrutiny. Here, the conduct the Ordinance prohibits—knowingly being present within 200 feet of a sideshow for the purpose of observing it as it progresses—lacks any significant expressive element.

B.    The Ordinance's incidental burden on recording sideshows does not alter this conclusion. Plaintiff's argument that the Ordinance directly regulates speech—because it has the effect of restricting some observation, observation is a prerequisite to recording, and recording is speech—mistakes both the Ordinance and First Amendment law. The Ordinance restricts only observing by those intentionally present at sideshows for the purpose of observing them because of unique threats to public safety associated with that conduct. Further, courts

23

have not recognized a generalized First Amendment right to observe all events in public. Generally applicable regulations that have the effect of restricting some observation for reasons unrelated to the suppression of speech do not trigger First Amendment scrutiny.

C.    That the Ordinance regulates conduct in a public forum also does not trigger First Amendment review. As the District Court acknowledged, the public forum doctrine does not override the threshold inquiry of whether a law regulates expression. Further, the Ordinance does not restrict speech in a public forum—rather, it restricts only certain non-expressive conduct and allows access to the forum for speech.

2.    If the Ordinance were subject to First Amendment scrutiny, it would be subject to and satisfy intermediate scrutiny.

A.    The Ordinance is content-neutral. It applies based on an actor's location and purpose, and not based on whether she is speaking, let alone her chosen topic or viewpoint.

B.    The Ordinance is also narrowly tailored to address the County's interests in public safety and quality of life. The Ordinance targets only intentionally participating in sideshows as a spectator, the precise behavior that creates an increased risk of injury, including injury

24

to spectators themselves. The Ordinance leaves open ample alternative channels to communicate information about sideshows. Reporters have many available means of recording sideshows, including from 200 feet away, and they may obtain and use recordings of sideshows made from within 200 feet. Further, reporters may interview participants, use public data about sideshows, and observe and record the police response and the aftermath of sideshows. The only thing they may not do is contribute to sideshows' dangers by joining the audience for them.

## ARGUMENT

## I.    Standard of Review

The Court reviews an order denying a preliminary injunction for abuse of discretion, and it reviews the underlying legal conclusions de novo. *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 398-99 (9th Cir. 2015). "The court does not review the underlying merits of the case, but rather whether the district court relied on an erroneous legal premise or abused its discretion" in denying the preliminary injunction. *Id.* To qualify for preliminary injunctive relief, a movant must "establish [1] a likelihood of success on the merits, [2] that it will suffer irreparable harm in the absence of injunctive relief, [3] that the balance of the

equities tips in its favor, and [4] that the public interest supports relief."

*Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024).

## II. The District Court correctly held that the Ordinance is not subject to First Amendment scrutiny because it is a generally applicable regulation of non-expressive conduct that, at most, marginally burdens expression.

The District Court correctly held that the Ordinance regulates only non-expressive conduct. It recognized that the First Amendment "only applies to conduct regulations if conduct with a 'significant expressive element' drew the legal remedy or if the [statute] has the inevitable effect of singling out those engaged in expressive activity." ER-6 (quoting *Int'l Franchise Ass'n*, 803 F.3d at 408) (internal quotation marks omitted). Contrary to Plaintiff's contention, mere observation is not expressive, whether or not it occurs on streets or sidewalks.

### A. The Ordinance's marginal burden on recording does not subject it to First Amendment review. Courts have not recognized an unlimited First Amendment right to observe.

Here, as the District Court held, the conduct the Ordinance regulates—knowingly being present within 200 feet of a sideshow for the purpose of observing the event—lacks any significant expressive

element. ER-6-10. Rather, it involves a restriction "for public safety reasons" of "locational activity" occurring "in public areas." ER-10. Moreover, the Ordinance does not target those engaged in expression. Instead, it "applies to all" individuals who gather in close proximity to exhibitions of reckless driving for the purpose of watching those events as they progress. ER-10-11.

As the District Court properly concluded, such generally applicable regulations of non-expressive conduct that only incidentally affect speech are not subject to review under the First Amendment. In *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986) ("*Arcara*"), the Supreme Court upheld the application of a state nuisance statute to close an adult bookstore that harbored prostitution. *Id.* at 707. The Court rejected the defendant's First Amendment defense, even though the state's action plainly curtailed speech by closing a bookstore. While noting that "every civil and criminal remedy imposes some conceivable burden on First Amendment activities," the Court held that "the First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books." *Id.* at 706-07. Similarly, First Amendment review does not apply to an

ordinance prohibiting outdoor fires despite its effect of prohibiting flag burning at a protest, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992), to an ordinance that prohibits booking unregistered short-term property rentals despite its incidental restriction of advertising, *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 686 (9th Cir. 2019), to statutes prohibiting firearms sales on public property despite their possible effect of preventing pro-gun speech at gun shows, *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 113 (9th Cir. 2024), to suspension of a license for an erotic dancing venue for serving alcohol without a liquor license despite its curtailing expressive dancing, *Talk of the Town v. Dep't of Fin. & Bus. Servs. ex rel. City of Las Vegas*, 343 F.3d 1063, 1069-70, 1073-74 (9th Cir. 2003), or to a Covid-19 stay-at-home order despite its requiring closure of tattoo parlors, *Mitchell v. Newsom*, 509 F. Supp. 3d 1195, 1201-02 (C.D. Cal. 2020). *See* ER 8. The Supreme Court and this Court have thus consistently recognized that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *HomeAway.com*, 918 F.3d at 685 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011)).

28

The District Court recognized that, like the regulations in *Arcara* and its successors, the Ordinance at most incidentally affects expression. ER-7-8. It proscribes spectator participation in sideshows, not expression of any kind. It defines a sideshow as "an occasion where one or more persons, for the purpose of performing a street race or reckless driving exhibition for one or more spectator(s) either blocks or impedes traffic on a street or highway or impedes access to an off-street parking facility." ACC § 10.40.020. Spectators are as much a part of a sideshow as is the reckless driving: the purpose of a sideshow is "performing a[n] . . . exhibition for . . . spectator(s)." *Id.* The Ordinance thus prohibits only *conduct:* intentional attendance at sideshows as a spectator.

The Ordinance does not outright prohibit knowingly watching or otherwise observing sideshows. Any individual may view a sideshow from 200 feet away, and individuals present for purposes other than to observe the sideshow may view it from any distance. The Ordinance prohibits observing by only those "spectators" who are knowingly "present" at— i.e., intentionally part of—the sideshow. *Id.* (defining "present" and "spectator"). Indeed, the Ordinance targets those intentionally present to watch the sideshow "*as it progresses.*" *Id.* (emphasis added). The latter

29

words emphasize the Ordinance's focus on those who join the audience for the event, not those who incidentally witness it.

Contrary to Plaintiff's arguments, the Ordinance does not trigger the First Amendment merely because it may incidentally limit a journalist's making audiovisual recordings while attending an illegal sideshow. Plaintiff argues that, by burdening some observation of sideshows, the Ordinance restricts the "pure speech" of recording and is thus subject to the First Amendment. Appellant's Opening Brief ("AOB") 32. Plaintiff's argument seeks to cobble together several disparate strands of First Amendment doctrine to create a radical new rule protecting all observation. Plaintiff seeks to amalgamate the rules that (1) the act of recording is protected activity as a link in the chain of production of speech, and (2) restrictions of speech in traditional public forums are strictly limited, with (3) the proposition that observation is a necessary prerequisite of recording, yielding a new proposed rule that all observation in a public forum is speech activity protected by the First Amendment. AOB 25. Plaintiff's new proposed rule, however, mistakes First Amendment law.

Although several cases have recognized First Amendment protection for recording and certain observation, courts have not created a

30

generalized First Amendment right to observe all events in public. The cases recognize the continued application of the principles in *Arcara* and *International Franchise Association* applied by the District Court.

For example, this Court's recent decision in *Project Veritas v. Schmidt*, __ F.4th __, No. 22-35271, 2025 WL 37879, at *6-9 (9th Cir. Jan. 7, 2025) (en banc) ("*Project Veritas*"), recognized that recordings, and the act of recording, are both protected by the First Amendment. *Project Veritas* held that a state law prohibiting most unannounced audio recording of oral conversations was subject to the First Amendment as applied to an organization involved in undercover journalism. *Id.* at *6-9. The Court reasoned that the act of making a recording is a step in the process of speech creation, and so direct regulation of that act triggered First Amendment review. *Id.* But *Project Veritas* also clarifies that First Amendment protection for recording does not encompass generally applicable regulations that only incidentally burden recording. *Id.* at *7. Protection for steps in the process of speech creation has limits: not all conduct "related in some way to speech creation, however attenuated," receives First Amendment protection. *Id.*

Plaintiff cites a series of cases that extended First Amendment protections to observation of police conduct or direct regulation of expressive activity related to observation. AOB 36. But these cases do not recognize a First Amendment right to all observation of matters of public concern.

Some courts have recognized a right to observe police conduct to ensure public scrutiny of police activity. *See, e.g.*, *Fields v. City of Philadelphia*, 862 F.3d 353, 355-56 (3d Cir. 2017); *see also Chestnut v. Wallace*, 947 F.3d 1085 (8th Cir. 2020) (right to observe police); *Sanchez v. City of Atherton*, No. 22-cv-03106, 2023 WL 137475 (N.D. Cal. Jan. 9, 2023) (same). But these police-observation cases recognize limits similar to those expounded in *Project Veritas*: restrictions on interference with police activity are not subject to First Amendment review merely because those restrictions incidentally limit observation of the police. *Fields*, 862 F.3d at 360 (recording activity that interfered with police likely not protected); *Jordan v. Adams Cty. Sheriff's Office*, 73 F.4th 1162, 1169-70 (10th Cir. 2023) (right to remain in area "to be able to criticize the observable police conduct" is not a right to physically interfere with officers).

32

Plaintiff cites two cases purportedly recognizing a right to observe unrelated to police activities, but in both cases, the regulations affected direct speech and were motivated by the suppression of expression. In *Brown v. Kemp*, 86 F.4th 745 (7th Cir. 2023), *cited at* AOB 37, the law "was specifically intended to target the expressive activities" of anti-hunting advocates, including their video recordings, rather than their conduct. *Id.* at 780. Likewise, *Western Watersheds Project v. Michael*, 869 F.3d 1189 (10th Cir. 2017), *cited at* AOB 38, applied the First Amendment to a statute that penalized trespassing for the purpose of collecting data, including notes and photographs, about natural resources. *Id.* at 1191-92. But it was because "[t]he challenged statutes apply *specifically* to the creation of speech" that "they are subject to the First Amendment." *Id.* at 1197 (emphasis added). The court suggested the result would have been different if plaintiffs had challenged the state's general trespassing statute, which would also preclude data collection. *Id.* Indeed, restricting trespassing specifically *for the purpose of recording data about resources* could only be intended to suppress the development of information about

33

resources—an intent that offends the First Amendment.[6] Neither *Brown* nor *Western Watersheds Project* creates generalized protection for any regulation burdening observation that neither directly regulates expression nor is motivated by the desire to suppress speech.

Consistent with these decisions, the Fifth Circuit has recently expressly refused to classify all "observing" as expressive activity. *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770 (5th Cir. 2024), *cert. denied*, No. 23-1105 (Oct. 7, 2024). A state statute prohibited flying drones over particular facilities such as prisons and large sports venues (the "no-fly" proscription) and separately prohibited using drones to "capture an image" of persons or property without their consent. *Id.* at 777-78. Following the line of cases Plaintiff cites, the court applied First Amendment scrutiny to the latter restriction because it directly

---

[6] In contrast, the Ordinance here is motivated by the desire to prevent people from remaining near reckless driving. That concern is not about speech. Moreover, the Ordinance does not single out for differential treatment "individuals who create speech," *see id.*, as might an ordinance that targets those who take notes, photographs, or recordings. Any person present for the purpose of observing the sideshow—i.e., any person who intentionally exposed herself to risks of injury, and who is more likely to remain present despite those risks—is liable, regardless of whether or not they intend to create speech.

34

regulated recording, but the court *refused* to apply that scrutiny to the no-fly provision. *Id.* at 787-88. The plaintiff argued the no-fly provision was subject to the First Amendment because it "*necessarily* prohibits photojournalists from capturing images from the air over those [restricted] facilities." *Id.* at 788. That is *precisely* Plaintiff's argument here, too. The court summarily rejected the argument, stating:

> There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right. *The right to speak and publish does not carry with it the unrestrained right to gather information.*

*Id.* (quoting *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965)) (emphasis added). Although plaintiffs were journalists who wanted to use drones to capture images for their reporting, the court held that the no-fly provision had "nothing to do with speech, or even expressive activity," and did not implicate the First Amendment. *Id*.

These cases are consistent with *Colten v. Kentucky*, 407 U.S. 104 (1972), which rejected a generalized First Amendment right to observe police conduct. In *Colten*, the Court held that a plaintiff arrested for

35

disorderly conduct after disobeying a police officer's move-on order in a dangerous road-side strip "had no constitutional right to observe the issuance of a traffic ticket or to engage the issuing officer in conversation at that time." *Id.* at 109-10. The Court noted that the State could enforce its traffic laws free from interference, and the crowded roadside strip exposed the police and the plaintiff to the risk of accident. *Id.* Thus, the First Amendment did not shield the plaintiff's interference with police activity, despite his aim of observing police officers carrying out official duties in public. *Id.*

The Ordinance is another such generally applicable regulation of conduct and is thus not subject to First Amendment scrutiny. It neither directly regulates expression nor was intended to suppress speech. The Ordinance does not prohibit recording, or even observation. It prohibits intentional presence near a dangerous activity for the purpose of watching that activity. Individuals who did not seek out the sideshow to watch it may record it, take notes on it, interview spectators, or observe it freely. Likewise, whether a spectator intends to or does create speech does not affect her liability: the Ordinance applies equally to the loud and the silent based on their presence for the purpose of watching the sideshow.

36

While the Ordinance has the effect of restricting some recording activity of those who wish to join the audience for a sideshow, that restriction is incidental to the Ordinance's purpose. As explained below, the Ordinance restricts spectators' presence for public safety reasons, because of the unique risks of injury that their presence poses to spectators and others, not for any reason related to suppressing speech. *See* Section III.A.2, *infra*. To put it bluntly, the Ordinance tries to stop people from placing themselves in the path of speeding cars, not to suppress speech about sideshows. The Ordinance is thus a generally applicable restriction of non-expressive conduct with only an incidental burden on speech, and it is not subject to the First Amendment.

As the District Court also correctly concluded, Plaintiff's role as a reporter does not change this analysis. ER-9; *see also Nat'l Press Photographers*, 90 F.4th at 788. "[T]he First Amendment right to gather news within legal bounds does not exempt journalists from laws of general applicability." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1190 (9th Cir. 2018); *see also Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991) ("[G]enerally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its

ability to gather and report the news."). The Ordinance does not treat Plaintiff any differently because he is a member of the press.

Nevertheless, Plaintiff argues that the Ordinance is subject to First Amendment scrutiny as applied to him because he wishes to engage in protected speech—recording sideshows for later reporting—that purportedly requires him to join the audience for a sideshow. *See* AOB 30-31. Plaintiff is incorrect. The Ordinance is not subject to First Amendment scrutiny as applied to Plaintiff simply because he wishes to engage in the non-expressive conduct prohibited by the Ordinance to further his own speech. If it were otherwise, the plaintiff's claim in *Colten* would have been subject to First Amendment scrutiny, as would have the journalist-drone operators' challenge in *National Press Photographers Association,* a painter's challenge to regulations of harmful air emissions from paints commonly used on building surfaces, and a newspaper company's challenge to logging regulations if the newspaper harvested timber to supply its press.[7] *See Project Veritas*, 2025 WL 37879, at *7.

---

[7] Accordingly, that *Project Veritas* recognized recording as protected speech does not mean the Ordinance is subject to First Amendment scrutiny based on its incidental restriction of recording. *Project Veritas* involved direct regulation of recording. 2025 WL 37879, at *7. This case—like the others in the *Arcara* line—involves only incidental restriction of

In addition to subjecting the Ordinance and other similar local side-show ordinances to the First Amendment,[8] Plaintiff's arguments would reach other criminal statutes that prohibit attending illegal events. *See, e.g.,* 7 U.S.C. § 2156(a)(2) (animal fights); Cal. Pen. Code § 413 (illegal boxing matches), § 597.5 (dog fights), § 597b (animal fights). Courts have repeatedly upheld such regulations against First Amendment challenges. *See, e.g., Hernández-Gotay v. United States*, 985 F.3d 71, 80 (1st Cir. 2021) (federal statute prohibiting spectating at animal fighting event did not infringe of freedom of speech or association); *People v. Bergen*, 883 P.2d 532, 544 (Colo. Ct. App. 1994).[9]

---

that speech, which does not trigger First Amendment review. Were it otherwise, a reporter could seek First Amendment review of speeding regulations preventing her from better filming car chases. The First Amendment is not concerned with such generally applicable regulations. *Arcara*, 478 U.S. at 708 (O'Connor, J., concurring) (noting the potential "absurd result that any government action that had some conceivable speech-inhibiting consequences, such as the arrest of a newscaster for a traffic violation, would require analysis under the First Amendment.").

[8] *See, e.g.*, City of San Diego Municipal Code § 52.5203; City of San Jose Code of Ordinances § 10.50.020; City of Los Angeles Municipal Code § 47.15.

[9] Plaintiff asserts that *Hernández-Gotay* did not consider the statutory provision banning attending cockfighting matches. AOB 34. But plaintiffs there challenged the law extending multiple provisions, including the attendance prohibition, to Puerto Rico. *Hernández-Gotay*, 985 F.3d at 75, 79; *see also Club Gallístico de Puerto Rico, Inc. v. United States*, 414

Finally, Plaintiff asserts that the District Court erred by equating spectating with participation in a sideshow, arguing that the Ordinance cannot punish spectators for others' unlawful conduct nor bar spectators from sideshows because they are unlawful. AOB 40-45. Plaintiff misses the point; the Ordinance does neither of these things. Rather, it prohibits joining the audience for sideshows because that conduct exposes audience members to risk of severe injury. *See* Section III.A.2, *infra*. Further, like the conduct of audiences at cockfights or illegal boxing matches, joining the audience for a sideshow perpetuates illegal activity. *Id.* Critically, the Ordinance does not bar reporting on sideshows—Plaintiff may describe sideshows or distribute recordings of sideshows without penalty—or target reporters or others engaged in speech. In short, the Ordinance does not label First Amendment conduct unlawful. *See* AOB 31. It targets non-expressive conduct for reasons unrelated to expression, and it is not subject to First Amendment scrutiny.

---

F. Supp. 3d 191, 203, 209-10 (D. Puerto Rico 2019) (district court decision reviewed by *Hernández-Gotay*; plaintiffs' challenge included the attendance prohibition).

**B.    A generally applicable law's regulation of conduct in a traditional public forum does not automatically subject the law to First Amendment review.**

Plaintiff also argues that the Ordinance is subject to First Amendment review because it purportedly restricts access to a traditional public forum. AOB 29-35. On the contrary, as the District Court explained, the public forum doctrine does not obviate the *threshold* inquiry of whether a law regulates expression or non-expressive conduct. ER-9. As the District Court stated, "The fact that an ordinance applies in a particularly expression-prone place does not transform the non-expressive conduct it regulates into conduct with a significant expressive element." *Id.* Otherwise, "all manner of local prohibitions could be invalidated by simply moving the proscribed conduct from the shadows to the streetcorners." *Id.*

Like the District Court here, other courts have applied the *Arcara* line of cases in traditional public fora. For example, in *Wright v. City of St. Petersburg*, 833 F.3d 1291 (11th Cir. 2016), a minister had been arrested in a city park—a traditional public forum—for obstruction of justice, and pursuant to statute, the arresting officer had ordered him not to return to the park for one year. *Id.* at 1293-94. The court rejected the

minister's First Amendment challenge, finding that *Arcara* controlled, not the cases governing speech restrictions in public fora. *Id.* at 1295-96 & n.4. As the District Court did here, *Wright* reasoned that First Amendment scrutiny applies only where "conduct with 'a significant expressive element'" drew the legal remedy, and it concluded that the state's challenged action responded to Plaintiff's obstruction rather than to his expression. *Id.* at 1296-97; *see also Doe v. City of Lafayette*, 377 F.3d 757, 764, 772 (7th Cir. 2004) (applying *Arcara* to hold that an order banning a sex offender from public parks was not subject to the First Amendment; finding public forum doctrine inapplicable). "*Regardless* of the nature of the forum, the First Amendment does not prohibit regulation of non-expressive activity unless the regulation 'impose[s] a disproportionate burden'" on speech. *Kreimer v. Bur. of Police*, 958 F.2d 1242, 1263 n.24 (3d Cir. 1992) (quoting *Arcara*, 478 U.S. at 704-05).

Plaintiff argues that *McCullen v. Coakley*, 573 U.S. 464 (2014), stands for a broad proposition that "a law that restricts access to a traditional public forum triggers First Amendment scrutiny when it is challenged by a person seeking to engage in speech in the restricted area." AOB 30. The argument fails for two reasons. First, that was not

42

*McCullen*'s holding. Second, the Ordinance regulates conduct in (and beyond) a public forum, not access to it.

*McCullen* explains that public fora receive special First Amendment attention because they are traditionally sites for *speech*. 573 U.S. at 476. The Court notes that public fora are "venues for the exchange of ideas," and "sites for discussion and debate"; they are "one of the few places" where one cannot change the channel and thus may reliably encounter new speakers, opinions, or audiences. *Id.* Thus, where *McCullen* refers to "restrict[ing] access to traditional public fora," *id.*, the Court refers specifically to access for the purpose of speaking, not access for all conduct regardless how attenuated its connection to speech.[10] And indeed, even though it did not mention speech on its face, the ordinance in *McCullen* cut off access to the sidewalk for *all* speech. *Id.* at 469, 476.

---

[10] Moreover, as *McCullen* emphasizes, the First Amendment specially protects speech in public fora because they are physical places in which public discourse may occur in real time. But Plaintiff does not seek access to sideshows to converse with other spectators on sideshows (or any other topic), and the Ordinance would not prevent that anyway. Rather he claims a right to observe activities in the forum—and non-expressive activities at that—so he may record them, so he may later publish them *elsewhere.* This serves none of the purposes of the public forum doctrine.

Plaintiff also cites *Nunez ex rel Nunez v. City of San Diego*, 114 F.3d 935, 950 (9th Cir. 1997), to argue that even regulations of conduct that restrict access to public fora are subject to First Amendment review. AOB 32. But the juvenile curfew in *Nunez* constituted "an all-encompassing restriction" of minors' access "to all forums for one-third of the day." 114 F.3d at 950. Thus, exactly like the ordinance in *McCullen*, the curfew ordinance "significantly restrict[ed] expression" in public fora. *Id.* at 950.

In contrast, the County's Ordinance does not restrict access to a public forum for speech; it regulates a narrow category of *conduct* in a public forum. It broadly preserves individuals' ability to speak in the public forum: they may sell girl scout cookies, ask for handouts, stump for a candidate, or advocate for fewer restrictions on sideshows—provided their purpose in being within 200 feet of a sideshow was not to join the sideshow's audience. In contrast to the ordinances in *McCullen* and *Nunez*, which precluded all expression by restricting virtually all access to a public forum, the Ordinance here only restricts one type of conduct—spectating at sideshows—that lacks a significant expressive element. *See* Section II.A, *supra*.

44

Plaintiff argues that the Ordinance restricts access to a public forum for *his* desired speech—i.e., recording sideshows to better report on them. AOB 31. He cites *Askins v. U.S. Department of Homeland Security*, 899 F.3d 1035, 1044 (9th Cir. 2018), and *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995), for the proposition that individuals have a First Amendment right to record matters of public interest in public. But *Askins* and *Fordyce* involved state actions that specifically targeted speech—photographs of government facilities in *Askins*, 899 F.3d at 1038 (CBP agents deleted plaintiffs' pictures of ports of entry), and video of a protest in *Fordyce*, 55 F.3d at 438-39 (issue of fact existed "regarding whether Fordyce was assaulted and battered by … police … to prevent or dissuade him" from filming). *Askins* and *Fordyce* do not hold that the First Amendment conveys a right to be free from generally applicable regulations of conduct in public places.[11] The District Court thus rightly distinguished them, holding the Ordinance here "does not involve an

---

[11] Courts have noted that regulations of presence cannot be used for the *purpose* of stopping expression. AOB 39-40; *Jordan*, 73 F.4th at 1169-70. Here, the County's purpose was protecting public safety, not limiting expression. *See* Section III, *infra*.

anti-recording component" and "is less about speech production and more about locational activity." ER-10.

Nor do the newsgathering cases that Plaintiff cites (AOB 37-38) create First Amendment protection from generally applicable regulations of conduct in a public forum. As the District Court noted, "the right to speak and publish does not carry with it the unrestrained right to gather information." ER-9 (quoting *Zemel*, 381 U.S. at 16-17). Indeed, the right to gather news does not give the press any special rights of access to areas closed to the public. *Houchins v. KQED, Inc.*, 438 U.S. 1, 11-12 (1978) (discussing cases). "Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded." *Branzburg v. Hayes*, 408 U.S. 665, 684-85 (1972).

The Ordinance here excludes those most likely to be at greater risk of injury—or to contribute to injuring others—from the scene of a crime. The First Amendment does not grant a right to duck under the yellow tape to interview the hostage-taker nor a right to stand directly below the ledge to get the best view of the jumper. It likewise does not give Plaintiff the right to join the audience for a sideshow.

Notably, this Court and the Supreme Court have an established test to determine "whether a member of the public has a First Amendment right to access a particular place and process"—including in public fora. *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 829 (9th Cir. 2020). Using a two-part test, the court asks "'[1] whether the place and process has historically been open to the press and general public' and [2] 'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Id.* (quoting *Press-Enterprise Co. v. Superior Court of Cal.*, 478 U.S. 1, 8 (1986)) ("*Press-Enterprise II*"). If both are true, a qualified right of access exists. *Id.* If Plaintiff's public forum argument were correct, there would be no need to apply this test in public fora, yet this Court did just that in *Index Newspapers.*

The *Press-Enterprise II* test is generally applied to government processes. *Leigh v. Salazar*, 677 F.3d 892, 899 (9th Cir. 2012). *Index Newspapers* explains that the test "balances the vital public interest in preserving the media's ability to monitor *government activities* against the government's need to impose restrictions if necessary for safety or other legitimate reasons." 977 F.3d at 830 (quoting *Leigh*, 677 F.3d at

47

900) (emphasis added). This context may explain Plaintiff's failure to mention the test. The Ordinance here does not concern government processes, but rather unlawful conduct: one present to observe a police response to a sideshow is not present to observe the sideshow.

Nevertheless, the *Press-Enterprise II* test shows there is no First Amendment right to access the audience for sideshows in public fora. The first part of the test asks whether "the place *and process*" has been historically open to the public. *Id.* at 829 (emphasis added). While public streets and sidewalks have been historically open to the public, there has been no historic right to come within close range of sideshows or other dangerous conduct. *See Colten*, 407 U.S. at 109-10 (officer could restrict access to highway verge adjacent to high-speed traffic). *Index Newspapers* demonstrates that there is no blanket First Amendment right to attend sideshows despite the fact they occur on public streets.

## III. If it were subject to First Amendment review, the Ordinance would satisfy intermediate scrutiny.

Because the Ordinance regulates non-expressive conduct without triggering the First Amendment, the Court need go no further to affirm the District Court's order. But even if the Ordinance were found to

48

regulate expressive activity, it would be subject to—and survive—intermediate scrutiny.

The Supreme Court applies intermediate scrutiny to laws that regulate expressive conduct or speech not based on or because of its content, but to further other legitimate governmental concerns. *McCullen*, 573 U.S. at 477. For such regulations, courts apply a more relaxed means-ends test than that applicable to content-based regulation: laws must be narrowly tailored to serve significant governmental interests, but they need not be the least restrictive means of advancing those interests. *Ward v. Rock Against Racism*, 491 U.S. 781, 798-800 (1989). The District Court correctly determined that the Ordinance satisfies this test.

If the Ordinance could be considered a regulation of expression at all, it could qualify, at most, as a regulation of the non-expressive aspects of conduct with both expressive and non-expressive elements, which is reviewed under *United States v. O'Brien*, 391 U.S. 367 (1968). Regulations of conduct pass muster under *O'Brien* if they further an important governmental interest unrelated to the suppression of expression and restrict expression no more than needed to further that interest. *Id.* at 376.

The District Court, however, correctly concluded that even if the Ordinance *directly* regulated expression, it would nevertheless be considered a valid regulation of the time, place, and manner of expression. ER-11-14. Such regulations pass First Amendment scrutiny if they are content-neutral, narrowly tailored to serve a compelling governmental interest, and if they leave open "ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

The Ordinance readily passes these tests. It regulates conduct based on its time and place—i.e., within 200 feet of an ongoing or imminent sideshow—because of the dangers to public safety and quality of life associated with that conduct, and without reference to the content of any speech. Moreover, it is both narrowly tailored and leaves open ample alternatives to communicate information.

Because the District Court analyzed the Ordinance as a time, place, and manner law, the County addresses that analysis first.

## A.    The Ordinance is content-neutral.

Plaintiff argues on appeal that the Ordinance is content-based—and thus subject to *strict* scrutiny—because it "prohibits recording the

50

sideshow but not other events at the same time and place." AOB 46. Plaintiff misapprehends the Ordinance's purpose and effect. As the District Court correctly concluded, the Ordinance applies based on "the location and purpose of an actor, not whether that actor speaks (and certainly not [on] the content of any speech)." ER-12.

In analyzing content-neutrality, courts look both to whether the law "draw[s] content-based distinctions *on its face*" and to whether it is "*justified* without reference to the content of the regulated speech." *McCullen*, 573 U.S. at 479-80 (emphasis added). Here, neither the Ordinance on its face nor its justification relates to the content of speech.

### 1.    The Ordinance is content-neutral on its face.

Facially content-based laws include those that require examination of the "content of the message that is conveyed" to identify a violation. *Id.*; *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see also City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (regulations requiring "an examination of speech only in service of drawing neutral, location-based lines" are content-neutral). Content-based laws "appl[y] to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. In contrast, when a

51

violation depends not on "what [plaintiffs] say," but on "where they say it," the law is content-neutral on its face. *McCullen*, 573 U.S. at 479-80. For example, in *McCullen*, the Court judged a law prohibiting access to a buffer zone around abortion clinics content-neutral because it applied based on speakers' location rather than their message. *Id.* The Court reasoned that one could violate the law "merely by standing in a buffer zone, without displaying a sign or uttering a word." *Id*. While acknowledging that the law's targeting of abortion clinics had "the inevitable effect of restricting abortion speech more than speech on other subjects," *id.* at 480, the Court did not disturb its conclusion that the law was content-neutral: "a facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics." *Id.*

Here, as the District Court concluded, ER-12, the Ordinance's application does not depend on the topic or message of any expression; it turns on an actor's "location and purpose." ER-12. A violation occurs when an individual knowingly spectates at a sideshow—i.e., stands within 200 feet for the purpose of observing the sideshow—regardless of any message they intend to convey or any topic they intend to discuss. ACC §§ 10.40.020, .030. As in *McCullen*, enforcement has nothing to do

52

with whether the individual speaks or what subject they speak about. As long as spectators are knowingly present to watch the sideshow, the Ordinance applies equally to silent spectators and spectators expressing any viewpoint on any subject.

Plaintiff argues that the Ordinance is content-based because it singles out speech on a single subject matter. AOB 46-49. But the Ordinance regulates *presence* in a particular location for a particular purpose, not speech. Of course, by regulating presence at sideshows, the Ordinance may inevitably have a greater incidental impact on speech about sideshows. But that does not make it content-based. *See McCullen*, 573 U.S. at 480 ("[A] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." (quoting *Ward*, 491 U.S. at 791)). Indeed, an individual standing within 200 feet of a sideshow may advocate for or against sideshows or animal rights or seek recruits to her religion or her book club, all without fear of citation, as long as she is not there for the purpose of observing the sideshow. The Ordinance does not target spectators' expression, if any there be, based on its topic or message; it targets their participation in a dangerous non-expressive event,

53

based on their intentional presence to engage in that event as a spectator. That purpose and effect is content-neutral. *See Project Veritas v. Ohio Elec. Comm'n*, 418 F. Supp. 3d 232, 258 (S.D. Ohio 2019) (law prohibiting undercover reporting of political campaigns was content-neutral because it did not prohibit reporting based on the topic or message, but only based on whether the campaign knew about the reporting).

Plaintiff insists that the Ordinance, on its face, "prohibits recording" of sideshows "but not other events at the same time and place." AOB 46. As the District Court concluded, however, the Ordinance does not prohibit recording, ER-10, and it certainly does not depend on what, if anything, is recorded, ER-12. An individual present within 200 feet of a sideshow for another purpose—e.g., to wait for a bus—may observe and record the sideshow without violating the Ordinance. Such an individual is not knowingly present for the purpose of observing the sideshow and so is not liable, even if they record a video of the sideshow and post it to social media. Plaintiff's own example (AOB 46-47) of an individual "present at an intersection to record a protest or traffic stop" who then records the sideshow receives the same analysis. That individual is not present

54

to observe the sideshow; she is "present … to record a protest" and is not liable, regardless of what she records.

Plaintiff argues that the Ordinance is nevertheless content-based as applied to him: "If [Plaintiff] is recording the sideshow, he is in violation of the Ordinance, because he has the purpose of observing the sideshow. If he is recording another event, he is not in violation of the Ordinance." AOB 50. That is incorrect. The Ordinance does not prohibit knowingly observing or recording a sideshow. It prohibits knowing *presence* within 200 feet *for the purpose of* observing a sideshow. Liability turns on *why* Plaintiff is within 200 feet of a sideshow, not whether he observes or records it. Indeed, if Plaintiff travels to an intersection to record or observe a sunset and records a sideshow while he is there, he is not liable. Conversely, if he travels to an intersection where a sideshow occurs to observe the sideshow, and, once there, he records the sunset instead, he is nevertheless liable. The Ordinance's application does not depend on the content or subject of his observations or recordings.

Plaintiff's cases (AOB 51) are thus inapposite. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27-28 (2010), and *Ness v. City of Bloomington*, 11 F.4th 914, 924 (8th Cir. 2021), concerned laws that

55

required reviewing the content of speech to identify violations—specifically, to see if the speech contained certain advice to terrorist groups or images of children in public parks, respectively. C*ohen v. California*, 403 U.S. 15, 18 (1971), involved a conviction based solely on the specific offensive message on plaintiff's clothing. Here, the Ordinance does not prohibit recording of sideshows, speech on the subject of sideshows, or any particular message about sideshows. An individual's recording of a sideshow is not enough to determine whether the individual was knowingly present for the purpose of observing the sideshow.

The Ordinance is similar to the content-neutral law this Court recently evaluated in *Project Veritas*, 2025 WL 37879, at *12-14. There, the Court held that a law prohibiting unannounced recordings of oral conversations, with exceptions for (1) recordings made during certain felonies and (2) recordings of law enforcement officers performing official duties, was content-neutral because the law and its exceptions applied "based on the circumstances in which a recording is made, not on the content of the conversation recorded." *Id.* at *13. Likewise, the Ordinance here draws distinctions based on an individual's location and purpose—not the

content of their observations, let alone the content of their recordings or utterances.

### 2. The Ordinance is justified without reference to the content of speech.

Courts evaluating content-neutrality must also evaluate whether the law's justification relates to the content of speech. *Reed*, 576 U.S. at 166; *Hill v. Colorado*, 530 U.S. 703, 719-20 (2000) ("[G]overnment regulation of expressive activity is 'content neutral' if it is justified without reference to the content of regulated speech."). The Ordinance seeks not to suppress speech about sideshows, but to protect public safety and quality of life from threats posed by—and to—spectators at sideshows. These concerns are content neutral. *See McCullen*, 573 U.S. at 480; *Ward*, 491 U.S. at 792 (regulation to control noise had nothing to do with content).

The Ordinance's statement of purpose addresses sideshows' damage to infrastructure; diversion of law enforcement resources; reckless driving, drug and alcohol use, and gun violence by drivers *and* spectators; property damage; air pollution; noise; spectators' garbage; disproportionate impacts on disadvantaged communities; and injury and death to spectators. ACC § 10.40.010. None of these factors relates to speech, let alone content.

Plaintiff implies the Ordinance is intended to deter speech about sideshows. AOB 53. But recording, reporting, or speaking about sideshows are neither elements of a violation nor aggravating factors. Plaintiff instead points to one statement in a letter from the Sheriff and a member of the Board of Supervisors noting that spectators often post sideshow videos on social media, which can encourage the activity. *Id.*, citing ER-184.

In context, however, this letter concerns spectators' conduct—not their speech. It explains that existing laws penalizing reckless drivers cannot deter sideshows because sideshows "include" spectators. ER-184; *see also* ACC § 10.40.020 (defining a sideshow as reckless driving "for one or more spectator(s)"); ER-104 ("Sideshows would not occur without spectators present to observe the reckless driving at close range."). The spectators cause their own problems: the letter lists drug and alcohol use, gun violence, vandalism, garbage, and injury and death. ER-185; ACC § 10.40.010. The letter also explains that spectators "encourag[e]" sideshows, including by gathering in large crowds and taking and posting videos on social media. ER-184. The statement about videos emphasized by Plaintiff is merely one of multiple examples of how spectators may

encourage sideshows. Nothing in the letter or the Ordinance itself mentions any restriction on posting videos or otherwise publicizing sideshows. As a whole, the letter shows that the Ordinance is intended to ensure spectators can "be held accountable"—not for posting videos to Instagram, but for their participation in an activity that threatens public safety and quality of life in all of the ways the letter discusses. ER-184-85; *cf. Raef v. Appellate Div. Super. Ct.*, 240 Cal. App. 4th 1112, 1131-32 (2015) (looking at legislative history document as a whole to determine that the legislature had a content-neutral motivation).

In any event, "courts will not invalidate a statute that is 'constitutional on its face, on the basis of what fewer than a handful of [legislators] said about it.'" *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 116 (9th Cir. 2024) (quoting *O'Brien*, 391 U.S. at 384) (alteration in original). In fact, the Board did not fully adopt the views in the letter, validating the Supreme Court's conclusion that "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates . . . others to enact it." *O'Brien*, 391 U.S. at 384. The Ordinance's findings copy verbatim most of the factors described in the letter cited by Plaintiff. *Compare* ER-184-85, *with* ACC § 10.40.010. But those findings *omit* concerns

about video and social media. *Id.* The Board's omission of this topic, combined with the absence of any evidence of speech-suppressive intent on the face of the Ordinance, suggests that the Board lacked intent to suppress speech about sideshows.

The Ordinance's focus on sideshows is also not evidence of an intent to suppress speech about sideshows. The Ordinance targets joining the audience for a sideshow because of unique dangers associated with that conduct. Knowing spectators are more likely than passersby at the same time and place to be associated with illegal drug use, gun violence, looting, noise, and reckless driving of their own; and they are more likely to remain at a sideshow despite these dangerous behaviors. ER 103-04. The sideshow-spectators' purpose places them and others at greater risk of injury. *Id.* The Ordinance thus prohibits spectators' behavior not because of any relation to speech or its subject matter, but because of the dangers of spectating to public safety and quality of life. These are both content-neutral concerns.

### B. The Ordinance is narrowly tailored to serve a compelling interest in public safety, including the safety of spectators themselves.

To pass intermediate scrutiny, a content-neutral time, place, and manner regulation must be narrowly tailored to serve a compelling government interest. *Cmty. for Creative Non-Violence*, 468 U.S. at 293. Unlike laws subject to strict scrutiny, such a regulation need not employ the least restrictive means of furthering the state's interests. *Ward*, 491 U.S. at 798-99. Rather, a law is narrowly tailored if it promotes an interest that "would be achieved less effectively absent the regulation." *Id.* at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 688-89 (1985)). Then, so long as the regulation does not "burden substantially more speech than is necessary to further the government's legitimate interest," it is narrowly tailored. *Ward*, 491 U.S. at 799-800. This analysis considers the law's effects as a whole, not its application to a particular individual. *Id.* at 801.

Applying intermediate scrutiny, the District Court held that the Ordinance was narrowly tailored to the County's public safety interests. ER 12-13. On appeal, Plaintiff argues that the Ordinance is subject to strict scrutiny and limits his arguments to the application of the attendant

61

"least restrictive means available" standard. AOB 51-60. Plaintiff's opening brief does not challenge the District Court's application of intermediate scrutiny's less demanding narrow tailoring requirement. Because Plaintiff has not addressed intermediate scrutiny's narrow tailoring requirement in its opening brief, Plaintiff has waived that issue. *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 638 (9th Cir. 2012) (appellant waives an issue on appeal "by failing to 'specifically and distinctly' argue the issue in his opening brief") (quoting *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992)).

Amici The Reporters Committee for Freedom of the Press and Los Angeles Times Communications, LLC address intermediate scrutiny. Doc. No. 14.1 at 19-27. But amici cannot raise issues waived by Plaintiff. *Preservation Coal., Inc. v. Pierce*, 667 F.2d 851, 861-62 (9th Cir. 1982); *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 719 n.10 (9th Cir. 2003).

Regardless, for the following reasons, the Ordinance satisfies intermediate scrutiny's narrow tailoring requirement, as well as the more stringent narrow tailoring required under strict scrutiny.

62

### 1. The Ordinance advances compelling interests in public safety and quality of life.

As the District Court observed, the Ordinance furthers a compelling interest in public safety by deterring spectating at sideshows. ER-12 ("[P]ublic safety is a well-recognized compelling governmental interest."). Sideshow spectators place themselves at severe risk of injury and death. ER-102. Further, by their presence, they encourage sideshows and the lawless behaviors associated with them. ER-103-04. Spectators contribute to the public safety hazards associated with sideshows, including looting and destruction of public property. ER-102-03. Even if spectators are not engaged in other unlawful activities, their presence complicates the law enforcement response, ER-103—e.g., police must take spectators' safety into account in determining whether, when, and how to move in, knowing any such action may cause drivers to recklessly speed away from the scene, risking further injury and death, ER-102. Spectators' presence also diverts law enforcement from other priorities. *Id.* Sideshows generate noise, air pollution, garbage, and traffic disruptions, at all hours of the day and night. ER-102-03. Many of these nuisances stem from spectators themselves. *Id.* By deterring spectating, the Ordinance deters these harms.

63

The interest in avoiding these harms is compelling. In fact, the acute dangers posed by sideshows make the County's public safety concerns even more compelling than those upheld in other cases. *See, e.g., Menotti v. City of Seattle*, 409 F.3d 1113, 1143 n.57 (9th Cir. 2005) (city had compelling interest in safety and security); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 947-48 (9th Cir. 2011) (city had compelling interests in traffic safety and flow); *see also Ward*, 491 U.S. at 796 (city had substantial interest in protecting residents from unwelcome noise).

Plaintiff argues that the District Court erred in holding that "deterring spectating" is a valid state interest because "suppressing speech" may not serve as an interest justifying a law. AOB 52-53. Plaintiff's critique errs in conflating spectating—defined by the Ordinance as presence within 200 feet of a sideshow for the purpose of observing it—with speech. *See* Section II, *supra*. By adopting the Ordinance, the County sought to deter interested individuals from remaining in close proximity to reckless driving, with the goal of reducing their risk of injury and the risk of other harms associated with their ongoing, intentional presence. ACC § 10.40.10. Protecting public safety in this way is a valid interest.

*Menotti*, 409 F.3d at 1143 n.57. Even if the Court were to agree with Plaintiff that observation constitutes conduct tantamount to speech, at *most,* the County's interest in deterring spectating targets non-expressive aspects of that conduct (i.e., presence in close proximity to dangerous activities, and not observation itself) for non-speech-suppressive purposes (i.e., reducing risk of injury). *See O'Brien*, 391 U.S. at 376-77; *see also* Section III.D, *infra* (discussing *O'Brien*'s application). The County's interest in deterring spectating is not an interest in suppressing speech.

### 2. The Ordinance advances interests in public safety and quality of life while imposing no greater burden on speech than necessary.

The Ordinance is narrowly tailored to advance public safety and quality of life because it hones in on the harmful behavior of spectating without restricting more speech than necessary. As the District Court observed, the Ordinance "features several limiting factors that avoid a greater-than necessary impingement on speech." ER-13. First, the Ordinance's "knowing presence" requirement avoids sweeping in innocent bystanders. Second, the 200-foot boundary allows individuals to view a sideshow from a safer distance, and from a position less likely to encourage sideshows and other illegal behaviors. ER-104. Third, the Ordinance

65

does not prohibit speaking or gathering information about sideshows—or any other topic—*from any location*, so long as the speaker is not knowingly within the 200-foot boundary to participate in the sideshow as a spectator. Fourth, the Ordinance does not prohibit observing, recording, or reporting; it says nothing about video, photographs, or note-taking. Contrary to Plaintiff's claims, AOB 45, individuals who are not knowingly present within 200 feet of a sideshow for the purpose of observing it—e.g., someone preaching or soliciting donations—may observe and record sideshows and share video or notes about license-plates with the media, the police, or their social media followers. Fifth, the Ordinance does not penalize the use of video or other information, even if obtained from an unlawful spectator. Ultimately, the County sought to avoid the harms created (and suffered) by sideshow spectators, and it determined that penalizing knowing spectating—i.e., being *present* for the purpose of viewing a sideshow, and not merely seeing a sideshow, let alone recording one—would reduce those harms. By prohibiting only spectating near a sideshow, the County chose means proportional to its ends.

Plaintiff argues that the County had available less restrictive means to suppress sideshows and related harms, including enforcing

existing laws against unlawful behaviors linked to sideshows. AOB 53-58. There are several flaws in this argument. First, it reflects the wrong standard: the government need not choose the *least* restrictive alternative to advance its interest, so long as it does not burden more speech than needed to achieve its goals. The Court should not second-guess the County's reasonable determination that the Ordinance's penalties would protect public safety from threats related to joining the audience for sideshows. *Ward*, 491 U.S. at 800-01 (requiring courts to "defer to the [government's] reasonable determination that its interest . . . would be best served by" its choice of measure); *Raef*, 240 Cal. App. 4th at 1135-36 (concluding that considering other alternatives "would constitute impermissible second-guessing of the Legislature").

Second, even if the County could deter sideshows themselves by increasing enforcement, the District Court correctly recognized that the County has *no* alternative means of deterring participating in sideshows as a spectator. ER-13. Laws against littering, noise, reckless driving, looting, and gun violence would not deter a spectator lacking any intent to engage in those behaviors. But spectators' mere presence causes harm. *See* Section III.B.1, *supra*.

67

The County also cannot achieve its interest in protecting spectators and others from harm solely by deterring sideshows. Even if the County were to drastically increase enforcement and virtually eliminate sideshows, if a sideshow *were* to occur, the County would still have a valid interest in deterring individuals from joining the audience for that sideshow to reduce the risk of injury. It is not enough to say that the County could, in theory, deploy the impractical and potentially impossible amount of resources to eradicate sideshows entirely. *See* AOB 57. The First Amendment does not leave the County powerless in the absence of perfect enforcement.

Notably, because the Ordinance is the least restrictive means of deterring individuals from joining the audience for sideshows to protect their safety, the Ordinance not only satisfies intermediate scrutiny, it satisfies strict scrutiny, as well. *See Porter v. Martinez*, 68 F.4th 429, 439 (9th Cir. 2023) (to survive strict scrutiny, regulation must be the "least restrictive means available" to further a compelling interest).

Finally, amici argue that the Ordinance's 200-foot barrier is unjustified. Doc. No. 14.1 at 25. Amici cannot raise issues waived by Plaintiff. *Preservation Coal., Inc.*, 667 F.2d at 861-62. In any event, amici are

incorrect. The Ordinance addresses dangers presented by reckless driving during a sideshow and in the immediate aftermath, when drivers fleeing police at high speeds injure and kill spectators. ER 102. A car traveling at 30 mph covers 200 feet in less than five seconds; a car traveling at 70 mph covers 200 feet in *less than two seconds*. Spectators' short reaction time to a threat of severe injury justifies the wide buffer for sideshows. The cases amici cites, concerning smaller buffers around abortion clinics, *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357 (1997), casual park-goers, *Berger v. City of Seattle*, 569 F.3d 1029 (9th Cir. 2009), and generic law-enforcement activity involving no specific risk of injury, *Ariz. Broadcasters Ass'n v. Brnovich*, 626 F. Supp. 3d 1102 (D. Ariz. 2022); *Reporters Comm. for Freedom of the Press v. Rokita*, __ F. Supp. 3d __, No. 1:23-cv-1805-JRS-MG, 2024 WL 4333137 (S.D. Ind. Sept. 27, 2024), are not comparable. None involved threats of severe physical injury to spectators, let alone threats from speeding cars being recklessly driven.

69

### 3. The Ordinance's distinction between sideshow spectators and others present at sideshows is justified by greater risks posed by and to spectators and does not render the Ordinance underinclusive.

Plaintiff and amici both argue that the County's interests in protecting safety is undermined by the Ordinance's application to spectators and not those present at sideshows for purposes other than observing them. AOB 58-59; Doc. No. 14.1 at 19-24. The Ordinance's distinction is fully valid, for several reasons.

First, as the District Court noted, targeting sideshow audiences protects public safety while avoiding sweeping in innocent conduct. ER-13. Crucially, it also avoids suppressing more *speech* than necessary to protect those at greatest risk of harm. Prohibiting *all* presence within 200 feet of a sideshow, for any reason, would criminalize wide swaths of conduct *and expression*. "When selecting among various options for combating a particular problem, legislatures should be encouraged to choose the one that restricts less speech, not more." *McCullen*, 573 U.S. at 482.

Second, sideshow audience members, unlike those present for other reasons, are more likely to contribute to other harms. As the District Court noted, even an otherwise law-abiding spectator is a "causal

contributor" to increasing risks of injury. ER-13; ER-103-04. Plaintiffs and amici argue that restricting spectators' "First Amendment conduct," AOB 56, to avoid encouraging sideshows' dangers is invalid as "guilt by association," Doc. No. 14.1 at 21-23; *see also* AOB 56-57. But the Ordinance does not penalize spectators for speech or expressive conduct.[12] *See* § II, *supra*.

Third, as the County argued below, ER-91, spectators are at greater risk than those present for other reasons: having sought out the sideshow, they are more likely to remain at the scene despite the dangers. An individual waiting for the bus when a sideshow breaks out is more likely to step back from the intersection than a thrill-seeker. Notably, the Ordinance defines a "spectator" as having intent to remain: a spectator is one present for the purpose of observing a sideshow event "as it progresses." ACC § 10.40.020.

---

[12] Amici's comparison to protests is inapposite. *See* Doc. No. 14.1 at 23. Protests are inherently expressive. Neither Plaintiff nor amici have claimed that sideshows themselves have expressive value. Sideshows are also inherently dangerous; protests are not. *Index Newspapers*, 977 F.3d 817, concerning protests, is thus distinguishable. Additionally, the state action in *Index Newspapers* implicated the public's interest in government transparency and accountability. *Id.* at 831. The Ordinance does not burden that interest.

Finally, as the Supreme Court has recently confirmed, "[T]he First Amendment imposes no freestanding under-inclusiveness limitation, and the Government 'need not address all aspects of a problem in one fell swoop.'" *Tik Tok Inc. v. Garland*, 604 U.S. __ (Jan. 17, 2025), slip opinion at 15 (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015)). The Ordinance advances the County's interest in protecting public safety and quality of life even if it does not eliminate *all* safety risks from side-shows.

## C.    The Ordinance leaves open ample alternative channels for communicating information.

Despite the District Court's conclusion that the Ordinance leaves ample alternative channels open for communication, ER 13-14, Plaintiff failed to address this issue in its Opening Brief.[13] Plaintiff has thus waived any objection, *AE ex rel. Hernandez*, 666 F.3d at 638, and amici's argument on the issue (Doc. No. 14.1 at 18-27) does not mitigate the waiver, *Preservation Coal., Inc.*, 667 F.2d at 861-62. In any event, the District Court correctly concluded that the Ordinance preserves ample channels for communication.

---

[13] Plaintiff also failed to address this issue below. ER 13-14.

Plaintiff has abundant means of communicating information about sideshows. As the District Court recognized, ER-13-14, Plaintiff may venture inside a 200-foot radius of a sideshow to interview residents, passersby, spectators, or even drivers, and to record these interviews. He may film a sideshow he happens upon while present for other purposes. From beyond the 200-foot radius, he may obtain video or photographs, including via a drone, telephoto lens, or a remotely operated camera installed at the scene of frequent sideshows prior to an event. *See Nicodemus v. City of South Bend*, 711 F.Supp.3d 1015, 1018, 1025-26 (N.D. Ind. 2024) (citing advanced recording technology to conclude that a buffer around police officers will not impair citizens' ability to record), *appeal filed*, No. 24-1099 (7th Cir. Jan. 23, 2024). He can publish sideshow video from any source, including from bystanders, law enforcement, spectators present within 200 feet, or even sideshow drivers—the Ordinance says nothing about images or recordings. *See* Erwin Chemerinsky, *Balancing the Rights of Privacy and the Press: A Reply to Professor Smolla*, 67 Geo. Wash. L. Rev. 1152, 1155 (1999) (anti-paparazzi law discussed in *Raef* had minimal First Amendment impact, in part because it did not limit publication of images, even those obtained during unlawful

73

reckless driving). He may film the subsequent law enforcement response from any distance. He may show the aftermath of sideshows—and has done so to great effect. ER-163, 167, 170-74, 176, 178. And he may continue to rely on public data and post-incident interviews.[14] ER-156.

Amici argue that one cannot adequately observe a sideshow from 201 feet away. Doc. No. 14.1 at 24-25. As an initial matter, they mistake the required analysis of ample alternative channels. The relevant question is whether the Ordinance "eliminates the only method of communication by which speakers can convey their message to a particular audience." *Project Veritas*, 2025 WL 37879, at *18 ("[A] regulation does not fail intermediate scrutiny merely because the other available channels of communication would convey the same message somewhat less conveniently or effectively."). The Ordinance does not eliminate anyone's ability to speak about sideshows or disseminate recordings of sideshows. As the District Court pointed out, ER-14, and amici acknowledge, Doc. No. 14.1 at 26, reporters may use video of sideshows

---

[14] Contrary to Plaintiff's claims, *see, e.g.*, AOB 45, individuals present at sideshows for purposes other than observation may continue to observe sideshows and report them to police, so the Ordinance will not eliminate this source of data for Plaintiff's reporting.

without penalty, regardless of where or from whom the video was obtained. In fact, all of Plaintiff's reporting on sideshows to date could be repeated without violating the Ordinance. ER-155-57 (Plaintiff does not state he has ventured within 200 feet of a sideshow).

Amici also offer no evidence that requiring observers to stand 201 feet away "effectively bans observation of a sideshow full stop." Doc. No. 14.1 at 25. Indeed, amici later *admit* that individuals "with high-quality cameras [may] film the sideshow from 201 feet away and distribute videos" of sufficient quality to "encourag[e] further lawbreaking." *Id.* at 26. Telephoto lenses, commercially available drones, and other remotely-operated cameras offer usable images from 201 feet. *Nicodemus*, 711 F.Supp.3d at 1025-26. Standing 200 feet away may not be *ideal* for an observer, but "an alternative channel need not be ideal, but merely adequate." *Project Veritas,* 2025 WL 37879 at *18. Because the Ordinance allows reporters and others to communicate information about sideshows and only slightly burdens their ability to observe sideshows in person, it leaves open ample alternative channels for communication.

### D.    The Ordinance satisfies the *O'Brien* test.

The Ordinance is not subject to First Amendment scrutiny because it regulates non-expressive conduct: intentionally joining a sideshow as an audience member. *See* Section II, *supra*. But even if the Ordinance regulated conduct with expressive elements, it would be valid under the test set forth in *United States v. O'Brien*, which upheld a regulation prohibiting destruction of draft cards.

As described above, joining a sideshow as a spectator constitutes conduct, not speech. *See Colten*, 407 U.S. at 109 (plaintiff's observation of traffic citation from highway "was not, without more, protected by the First Amendment"). Assuming *arguendo* that the conduct asserted by Plaintiff—joining a sideshow to record and report on it—involves expressive conduct, it does so as part of a course of conduct involving non-speech (presence) and speech (recording and reporting) elements. Just as public nudity may be expressive in some activities and not others—e.g., when combined with erotic dancing, but not when topless sunbathing, *see Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 571 (1991)—observing sideshows may be no more expressive than watching a sporting match, *James v. City of Long Beach*, 18 F. Supp. 2d 1078, 1083 (C.D. Cal. 1998) (sports

fans are not engaged in expressive conduct). Because the Ordinance targets the non-speech elements of sideshow-spectators' conduct for public safety and quality of life purposes unrelated to the suppression of speech, and because it restricts no more speech than necessary to further its goals, it withstands intermediate scrutiny under *O'Brien*. *See Project Veritas v. Ohio Elec. Comm'n*, 418 F. Supp. 3d at 256, 258 (law prohibiting undercover reporting of political campaigns was valid under *O'Brien* because it targeted non-expressive conduct—infiltration of campaigns—to further interests in promoting election integrity unrelated to suppressing speech); *see also Raef*, 240 Cal. App. 4th at 1133-36 (law penalizing reckless driving to obtain images for commercial purposes was valid under *O'Brien* when it targeted behavior because of its unique dangers to public safety and not to suppress images).

Regulation of conduct with both non-expressive and expressive elements must be upheld

> [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial government interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on . . . [expression] is no greater than is essential to the furtherance of that interest.

*O'Brien,* 391 U.S. at 376-77. The Ordinance satisfies this test.

First, Plaintiff does not assert that the Ordinance exceeds "the constitutional power of the Government," only that it allegedly infringes on expression. Second, the Ordinance furthers compelling interests in public safety and quality of life. *See* Section III.B, *supra*. Third, those interests do not relate to the suppression of speech. The Ordinance says nothing about recording, reporting, or speech of any kind on its face; nor is it justified by the suppression of speech, let alone speech on any particular subject or viewpoint. *See* Section III.A, *supra*; *see also Project Veritas v. Ohio Elec. Comm'n*, 418 F. Supp. 3d at 259 (recognizing that this element of *O'Brien* is satisfied if the law is content-neutral). Finally, the Ordinance restricts no more expression than necessary to achieve its interests: it is narrowly tailored. *See* Section III.B, *supra*; *see also Ward*, 491 U.S. at 798 (the *O'Brien* analysis effectively duplicates the time, place, or manner analysis); ER-11 n.1 (same).

## CONCLUSION

For the foregoing reasons, the Court should affirm the District Court's order denying a preliminary injunction. Should the Court conclude that Plaintiff has established a likelihood of success on the merits of his claim, the Court should remand to the District Court for further

proceedings to determine whether Plaintiff has satisfied the remaining requirements for a preliminary injunction, including whether he would experience irreparable harm absent a preliminary injunction. *A Woman's Friend Pregnancy Resource Clinic v. Becerra*, 901 F.3d 1166, 1168 (9th Cir. 2018) (remanding for reconsideration of remaining preliminary injunction factors).

January 31, 2025            SHUTE, MIHALY & WEINBERGER LLP


By:    s/Matthew D. Zinn
       MATTHEW D. ZINN
       AARON M. STANTON

       Attorneys for Defendants-Appellees
       County of Alameda and Yesenia
       Sanchez

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  24-6814

I am the attorney or self-represented party.

**This brief contains**  13,487  **words,** including  0  words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [        ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/ Matthew D. Zinn  **Date**  01/31/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                    *Rev. 12/01/22*